UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 06-20442-CR-UNGARO-BENAGES/O'SULLIVAN

UNITED STATES OF AMERICA,

    Plaintiff,

v.

DWIGHT MOSS,

    Defendant.
_____/

## REPORT AND RECOMMENDATION

THIS CAUSE is before the Court on the defendant's Motion to Suppress Evidence and Statements. (DE# 21, 10/20/06). On October 25, 2006, this case was referred to the undersigned by the Honorable Ursula Ungaro-Benages, United States District Court Judge for the Southern District of Florida. (DE# 23, 10/25/06). Having heard oral argument on November 9, 2006 and carefully considered the defendant's motion, the court file and applicable law, the undersigned respectfully recommends that the defendant's Motion to Suppress Evidence and Statements (DE# 21, 10/20/06) be **DENIED**.

## BACKGROUND

The defendant is charged with use of unauthorized access devices in violation of Title 18, United States Code, Section 1029(a)(2), effecting transactions with access devices issued to another person in violation of Title 18, United States Code, Section 1029(a)(5), aggravated identity theft in violation of Title 18, United States Code, Section 1028A and possession of a firearm by a convicted felon in violation of Title 18, United States Code, Section 922(g)(1).

## **FINDINGS OF FACT**

In February 2006, Pembroke Pines Police Sgt. Raimondi received a call from his wife advising him that their Sam's Club credit card had been declined because their credit limit had been exceeded. Sgt. Raimondi contacted Sam's Club and learned that a new user had been added to the account and that their credit limit had been increased to $15,000.00. Sgt. Raimondi reported this incident to Pembroke Pines Detective Charles Laughlin, a member of the Joint Fraud Task Force.

The next day, Sgt. Raimondi visited the Sam's Club store in Sunrise, Florida, where the new user was added. An employee provided Sgt. Raimondi with a copy of the Sam's Club card that was issued under the name "Dwight Moss" and the application that was used to add the defendant to Sgt. Raimondi's Sam's Club account. The application contained a driver's license number.

Sgt. Raimondi ran the driver's license number through a database and obtained a photograph of the defendant which matched the photograph on the Sam's Club card. Sgt. Raimondi also ran a criminal history check and an Autotrack search on the defendant. The criminal history check showed the defendant had previously been convicted of a felony. The Autotrack search revealed several addresses that were associated with the defendant. One of the addresses was near the Pembroke Pines Police Station.

During his lunch break, Sgt. Raimondi drove to that address in an unmarked vehicle. He saw the defendant working on a go-cart in his front yard with his young son. Sgt. Raimondi recognized the defendant from the photographs on the Sam's Club card and the driver's license. The go-cart appeared new. Sgt. Raimondi contacted Sam's Club to determine whether this was one of the items that had been purchased on his Sam's Club account. The Sam's Club employee

confirmed that a go-cart had been purchased and described the go-cart as yellow with red seats and the words "Crossfire" written on it. The description matched the go-cart the defendant was working on.

Sgt. Raimondi called Detective Laughlin to advise him that he had located the defendant and asked Detective Laughlin to contact a marked unit from the Miami-Dade police department.

Sgt. Raimondi then followed the defendant to a tire repair shop and waited for the defendant to complete a business transaction. Sgt. Raimondi continued following the defendant back to the defendant's home but stopped following the defendant when the defendant turned on an intersecting street near the defendant's home.

Detective Laughlin was outside the defendant's home when the defendant arrived home. The defendant parked his truck in front of the house but not in the driveway. Detective Laughlin asked the defendant for his driver's license when he got out of his truck. The defendant provided Detective Laughlin an official State of Florida identification card. Detective Laughlin did not return the defendant's identification card until after the defendant provided a recorded statement at the Pembroke Pines Police Station. Detective Laughlin told the defendant that he was conducting an investigation of fraudulent credit card transactions. The defendant and Detective Laughlin agreed that the Defendant should take his son inside the house before discussing the matter.

Sgt. Raimondi arrived at the defendant's home a few minutes later. He parked behind the defendant's truck but did not block it in. There were no obstructions preventing the truck from moving forward. Detective Laughlin was standing outside of a fence that surrounds the defendant's property. Detective Laughlin read the defendant his <u>Miranda</u> rights from a <u>Miranda</u> card. The defendant said he understood his rights. The defendant asked Detective Laughlin

3

whether he was going to be arrested. Detective Laughlin responded that he was not going to arrest the defendant that day. Both Detective Laughlin and Sgt. Raimondi carried firearms that were holstered and visible during their encounter with the defendant. The firearms were never drawn from their holsters or otherwise used to intimidate the defendant. Detective Laughlin did not raise his voice or threaten to take the defendant to jail. The defendant was relaxed and conversational with the police.

Detective Laughlin asked the defendant about other items that were purchased on Sgt. Raimondi's Sam's Club account. The defendant responded that he only kept the go-cart and did not have the other items. Detective Laughlin asked the defendant if he could look inside his house to confirm that the items were not there. The defendant agreed to allow the officers to look inside his house. The defendant secured the dogs that were in the fenced front yard and allowed the police officers into his home. There were women and children in the home.

The officers conducted a cursory search through the main part of the house. They did not open drawers or look inside the bedrooms, bathrooms or closets. The defendant also agreed to allow the officers to look inside a utility trailer. The utility trailer contained a large quantity of lawn mowers and power tools. Some of the tools were in unopened boxes and others appeared new.

After the officers finished their search, the defendant agreed to go to the police station to provide a statement. The defendant was transported to the police station by two police officers in an unmarked vehicle. At the police station, the defendant gave a brief recorded statement which the transcript indicates lasted a total of seven minutes. The defendant's identification card was returned to him at the end of the interview and the defendant called someone to pick him up at the police station. The defendant was never handcuffed.

## ANALYSIS

I. **The Defendant's Statements to Law Enforcement**

The defendant seeks to suppress statements he made to law enforcement at the Pembroke Pines Police Station. (DE# 21, 10/20/06). The defendant argues that these statements directly flowed from the illegal seizure of the defendant on the same date. The defendant claims he was seized by law enforcement, without probable cause, in his front yard and was coerced to consent to a search of his home. The government argues it had reasonable suspicion to conduct an investigatory stop of the defendant under Terry v. Ohio, 392 U.S. 1 (1968) and that the defendant voluntarily consented to a search of his home. (DE# 28 at 5, 11/3/06).

A. **Terry Stop**

A person may be briefly detained by law enforcement for investigative purposes only if (1) the officers have a reasonable suspicion that the suspect was involved in, or is about to be involved in, criminal activity and (2) the stop was reasonably related in scope to the circumstances which justified the interference in the first place. Terry, 392 U.S. at 20. Reasonable suspicion is determined from the collective knowledge of the officers involved in the stop. U.S. v. Williams, 876 F.2d 1521, 1524 (11th Cir. 1989).

Here, the police officers had ample reasonable suspicion to justify the investigative stop of the defendant. Sgt. Raimondi recognized the defendant from the driver's license and Sam's Club photographs. A Sam's Club employee confirmed that the go-cart the defendant was working on match the description of the go-cart purchased on Sgt. Raimondi's Sam's Club account. Moreover, the stop was reasonably related in scope. Thus, the defendant's Fourth Amendment rights were not violated.

### B.     The Defendant Was Free to Leave

The encounter between the defendant and the police did not constitute a seizure of the defendant. In view of all the surrounding circumstances, a reasonable person would have believed he was free to leave during the defendant's encounter with the police.[1] In determining whether a defendant was free to leave, the courts have looked to the following factors: "whether a citizen's path is blocked or impeded; whether identification is retained; the suspect's age, education and intelligence; the length of the suspect's detention and questioning; the number of police officers present; the display of weapons; any physical touching of the suspect[] and the language and tone of voice of the police." United States v. De La Rosa, 922 F.2d 675, 678 (11th Cir. 1991).

Here, there is no credible evidence that the police officers spoke in a harsh tone or threatened the defendant. They did not touch the defendant or impede or block his path.[2] The police assured the defendant that he was not under arrest and would not be arrested that day. Although the police officers were armed, they never removed their guns from their holsters or otherwise used their guns to intimidated the defendant.

Detective Laughlin did not return the defendant's identification card until the defendant traveled to the police department and gave a statement. However, when the defendant was stopped he was already home and could have terminated his encounter with the police by going into his home. See De La Rosa, 922 F.2d at 678, n. 2 (distinguishing case from United States v. Thompson, 712 F.2d 1356, 1361 (11th Cir. 1983) "because unlike the defendant in Thompson, the appellant had already exited his vehicle and was proceeding toward his home for the evening. Thus, temporary

---

[1] Even if the defendant was not free to leave, there was sufficient probable cause to seize the defendant if the police had chosen to do so.

[2] Although Sgt. Raimondi parked behind the defendant's truck, the defendant's truck was not blocked in. There were no obstructions preventing the defendant from driving forward.

6

retention of the license did not preclude the appellant from terminating his encounter by going into his apartment.") In De La Rosa, the Eleventh Circuit held that "although the defendant's driver's license may have been temporarily retained, a reasonable person under the circumstances would have believed he was free to leave." Id. at 678. Thus, in view of all the surrounding circumstances, a reasonable person would have believed he was free to leave during the defendant's encounter with the police.

C.  **Consent to Search**

Additionally, the undersigned finds that the defendant voluntarily consented to the search of his home. The government has the burden of proving that consent to search was given voluntarily, as an independent act of free will and not mere acquiescence to police authority. Florida v. Royer, 460 U.S. 491(1983). To be considered voluntary, a consent to search must be the product of an essentially free and unconstrained choice. United States v. Garcia, 890 F.2d 355, 360 (11th Cir., 1989). Whether consent was in fact voluntary or a product of express or implied duress or coercion is to be determined by the totality of the circumstances. United States v. Mendenhall, 446 U.S. 544 (1980).

Here, the totality of the circumstances demonstrate that the defendant voluntarily consented to the search. The defendant was not constrained in any manner. The police officers did not have their guns drawn and they made no threats. The facts here are less coercive than in Garcia, 890 F.2d at 360, where the Eleventh Circuit, found a defendant's consent to be voluntary when the defendant was arrested in the front yard of his house by fourteen law enforcement agents and then taken inside after the agents conducted a "protective sweep" of the house. Garcia was handcuffed when he gave the agents consent to search the house. The Eleventh Circuit noted that it had approved consent given under "far more coercive conditions" and stated, "we cannot conclude that these factors caused

Garcia's consent to become involuntary." Id. at 362. In this case, the defendant voluntarily permitted the police officers to search his house.

D.     **Miranda**

The defendant voluntarily waived his Miranda rights when he provided a recorded statement to Detective Laughlin.[3] In order to establish a waiver of Miranda rights, the government must show, by a preponderance of the evidence, that the defendant voluntarily, knowingly, freely and intelligently waived those rights, with knowledge of the consequences of the waiver. Colorado v. Connelly, 479 U.S. 157, 168 (1986). The validity of the waiver depends upon the particular facts and circumstances surrounding the case, including the background, experience and conduct of the accused. Edwards v. Arizona, 451 U.S. 477, 482 (1981). Factors that should be considered in making such a determination include: age of the accused, educational level, level of intelligence, whether there was advisement of constitutional rights, length of detention and the nature of the questioning. See Townsend v. Sane, 372 U.S. 293, 307 (1962).

The defendant was read his Miranda rights by Detective Laughlin and agreed to waive those rights. The statements made by the defendant, after having been read his Miranda rights, were voluntary. The defendant had prior experience with the criminal justice system and was neither coerced nor threatened into making statements to law enforcement. Accordingly, it is recommended that the defendant's statements not be suppressed.

---

[3] Although, Detective Laughlin gave the defendant Miranda warnings, he was not required to do so. See California v. Beheler, 463 U.S. 1121, 1121-22 (1983) (holding that Miranda warnings are not required if the person is not placed under arrest, voluntarily comes to the police station and is allowed to leave unhindered by police after a brief interview). Furthermore, the fact that the defendant was given Miranda warnings did not convert a Terry stop into an arrest. See United States v. Diaz-Lizaraza, 981 F.2d 1216 (11th Cir. 1993).

## II. Defendant's Request for a <u>Franks</u> Hearing

A warrant affidavit containing false statements, made knowingly and intentionally or with reckless disregard for the truth, may require the issuing judge to invalidate the search warrant if the remaining information in the affidavit is insufficient to establish probable cause. <u>Franks v. Delaware</u>, 438 U.S. 154, 155 (1978). This Court may assume <u>arguendo</u> that the challenged misstatements amounted to a deliberate falsehood and find no need for a hearing if "there remains sufficient content in the warrant affidavit to support a finding of probable cause." <u>U.S. v. Weber</u>, 808 F.2d 1422, 1424 (11th Cir. 1987) (quoting <u>Franks</u>, 438 U.S. at 171-72). The remaining information in the affidavit supporting the search warrant is afforded a presumption of validity. <u>Franks</u>, 438 U.S. at 171.

Paragraph 11 of the warrant affidavit states that "[the defendant] agreed to an interview at the Pembroke Pines Police Department. After being advised of his <u>Miranda</u> rights again, [the defendant] waived his rights and provided a taped statement to Detective Laughlin, admitting his use of Sgt. Raimondi's Sam's Club account." (DE# 21 at Exhibit 3, 10/20/06). The defendant argues that "he did not voluntarily consent to the initial search[,] ... was not 'advised of his <u>Miranda</u> rights again" and never waived those rights. <u>Id</u>. at 10. However, in the transcript of the recorded statement, the defendant agrees that Detective Laughlin previously read to the defendant his <u>Miranda</u> rights at the defendant's home. <u>Id</u>. at Exhibit 1. The defendant further acknowledges that he fully understood his rights and was willing to speak to Detective Laughlin. <u>Id</u>. Thus, the defendant has failed to prove that the government's affidavit contained false statements, made knowingly and intentionally or with reckless disregard for the truth as required by <u>Franks</u>.

Moreover, assuming that the challenged statements amounted to a deliberate falsehood, there remains sufficient information in the warrant affidavit to support a finding of probable cause. The subject warrant affidavit lists other incidents of credit card fraud that the defendant was suspected

of independent of the subject investigation. These other incidents provide probable cause for the warrant.

### III. The Warrant

Additionally, the defendant argues that the warrant was overly broad and general in its description of the property to be seized "without providing any identifying factors concerning these broad categories of property." (DE# 21 at 2, 10/20/06).

The Fourth Amendment requires that a search warrant particularly describe the place to be searched and the things to be obtained. This requirement ensures that a search will be carefully tailored to its justifications and will not take on the character of a wide-ranging exploratory search that the Framers of the Constitution intended to prohibit. Morrison v. Garrison, 480 U.S. 79, 84 (1987). When evaluating a warrant, it is sufficient if the description is such that an officer with a search warrant can with reasonable effort ascertain and identify the place intended to be searched. United States v. Weinstein, 762 F.2d 1522, 1532 (11th Cir. 1985).

The requirement that warrants shall particularly describe the things to be seized makes general searches under them impossible and prevents the seizure of one thing under a warrant describing another. As to what is to be taken, nothing is left to the discretion of the officer executing the warrant. Marron v. United States, 275 U.S. 192, 196 (1965). A description is considered sufficiently particular when it enables the searcher to reasonably ascertain and identify the things authorized to be seized. United States v. Betancourt, 734 F.2d 750, 755 (11th Cir. 1984).

The subject warrant permitted the seizure of "fraudulently obtained merchandise, credit cards, credit card information and statements, financial records[] and account numbers and other victim information that may be stored on computers." (DE# 21 at Exhibit 3, 10/20/06). A police officer executing the warrant could easily read the warrant and reasonably know what items were to be

seized. The police were authorized to seize all records or storage devices that contained names of possible victims. Again, the police could easily identify at the time of the search any names and were authorized to seize records or devices that contained those names.

The defendant also argues that the gun seized during the execution of the warrant should be suppressed because it was not listed on the warrant, within an area accessible to the defendant or in plain view. (DE# 21 at 2, 10/20/06). The defendant attaches an inventory of the items seized in connection with this investigation. Id. at Exhibit 3. The inventory lists a gun that was seized from the defendant's house by the warrant. Although the gun was not one of the items listed in the search warrant, there is no evidence that the gun was not in plain view. At the time they executed the warrant, the police knew the defendant was a convicted felon. The police were authorized to search for documents and could therefore search anywhere in the house that a document could be hidden. The seizure of the gun during the document search is not unlawful as it is evidence of another crime, that is possession of a firearm by a convicted felon in violation of 18 U.S.C. § 922(g)(1). See U.S. v. Johnson, 713 F.2d 654 (11th Cir. 1983) (holding that property may be seized under plain-view doctrine where in the course of performing a lawful search for items listed on warrant, police officers come across other incriminating items). Thus, the gun should not be suppressed.

## RECOMMENDATION

For the foregoing reasons, the undersigned recommends that the defendant Dwight Moss' Motion to Suppress Evidence and Statements (DE# 21, 10/20/06) be **DENIED.** Pursuant to 28 U.S.C. §636(b)(1)(B) and (C), the parties may serve and file written objections to this Report and Recommendation with the Honorable Ursula Ungaro-Benages, United States District Judge, within ten (10) days of receipt of a copy of this Report and Recommendation. See Nettles v. Wainwright,

11

677 F.2d 404 (5th Cir. 1982).

DONE AND ORDERED in Chambers, at Miami, Florida, this **17th** day of November, 2006.

JOHN J. O'SULLIVAN
UNITED STATES MAGISTRATE JUDGE

Copies provided to:
U.S. District Judge Ungaro-Benages
All Counsel of Record