UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 06-20442-CR-UNGARO-BENAGES

UNITED STATES OF AMERICA,

vs.

DWIGHT MOSS,

      Defendant.
_____/

## ORDER AFFIRMING MAGISTRATE JUDGE'S REPORT

THIS CAUSE is before the Court on Defendant's Motion to Suppress Evidence and Statements.  DE 21.  The matter was referred to Magistrate Judge O'Sullivan, who conducted an evidentiary hearing.  At the hearing, the United States presented the testimony of two law enforcement officers, whereas the Defendant neither testified nor produced other evidence.  On on November 17, 2006, Magistrate Judge O'Sullivan issued a Report recommending that Defendant's Motion be denied.  DE 30.  Defendant's Objections to the Report (DE 35) are addressed below.

### Facts[1]

In February 2006, Pembroke Pines Police Sgt. Raimondi received a call from his wife advising him that their Sam's Club credit card had been declined because their credit limit had been exceeded.  Sgt. Raimondi contacted Sam's Club and learned that a new user had been added

---

[1] The following facts are adopted as stated in the Report (*see* DE 30 at 2-4); except as otherwise indicated, the parties have not objected in this regard.  *See, e.g., LoConte v. Dugger*, 847 F.2d 745, 749-50 (11th. Cir. 1988) (stating that "[f]indings of fact made by a United States magistrate under the authority of 28 U.S.C. § 636, and which are accepted and adopted by the district court without objection by any party, may be reviewed on direct appeal only for 'plain error or manifest injustice.'").

to the account and that their credit limit had been increased to $15,000.00.  Sgt. Raimondi reported this incident to Pembroke Pines Detective Charles Laughlin, a member of the Joint Fraud Task Force.

  The next day, Sgt. Raimondi visited the Sam's Club store in Sunrise, Florida, where the new user was added.  An employee provided Sgt. Raimondi with a copy of the Sam's Club card that was issued under the name "Dwight Moss" and the application that was used to add the defendant to Sgt. Raimondi's Sam's Club account.  The application contained a driver's license number.

  Sgt. Raimondi ran the driver's license number through a database and obtained a photograph of the defendant which matched the photograph on the Sam's Club card.  Sgt. Raimondi also ran a criminal history check and an Autotrack search on the defendant.  The criminal history check showed the defendant had previously been convicted of a felony.  The Autotrack search revealed several addresses that were associated with the defendant.  One of the addresses was near the Pembroke Pines Police Station.

  During his lunch break, Sgt. Raimondi drove to that address in an unmarked vehicle.  He saw the defendant working on a go-cart in his front yard with his young son.  Sgt. Raimondi recognized the defendant from the photographs on the Sam's Club card and the driver's license.  The go-cart appeared new.  Sgt. Raimondi contacted Sam's Club to determine whether this was one of the items that had been purchased on his Sam's Club account.  The Sam's Club employee confirmed that a go-cart had been purchased and described the go-cart as yellow with red seats and the words "Crossfire" written on it.  The description matched the go-cart the defendant was working on.

Sgt. Raimondi called Detective Laughlin to advise him that he had located the defendant and asked Detective Laughlin to contact a marked unit from the Miami-Dade police department.

Sgt. Raimondi then followed the defendant to a tire repair shop and waited for the defendant to complete a business transaction. Sgt. Raimondi continued following the defendant back to the defendant's home but stopped following the defendant when the defendant turned on an intersecting street near the defendant's home.

Detective Laughlin was outside the defendant's home when the defendant arrived home. The defendant parked his truck in front of the house but not in the driveway. Detective Laughlin asked the defendant for his driver's license when he got out of his truck. The defendant provided Detective Laughlin an official State of Florida identification card. Detective Laughlin did not return the defendant's identification card until after the defendant provided a recorded statement at the Pembroke Pines Police Station. Detective Laughlin told the defendant that he was conducting an investigation of fraudulent credit card transactions. The defendant and Detective Laughlin agreed that the Defendant should take his son inside the house before discussing the matter.

Sgt. Raimondi arrived at the defendant's home a few minutes later. He parked behind the defendant's truck but did not block it in. There were no obstructions preventing the truck from moving forward. Detective Laughlin was standing outside of a fence that surrounds the defendant's property. Detective Laughlin read the defendant his *Miranda* rights from a *Miranda* card. The defendant said he understood his rights. The defendant asked Detective Laughlin whether he was going to be arrested. Detective Laughlin responded that he was not going to arrest the defendant that day. Both Detective Laughlin and Sgt. Raimondi carried firearms that

were holstered and visible during their encounter with the defendant. The firearms were never drawn from their holsters or otherwise used to intimidate the defendant. Detective Laughlin did not raise his voice or threaten to take the defendant to jail. The defendant was relaxed and conversational with the police.[2]

Detective Laughlin asked the defendant about other items that were purchased on Sgt. Raimondi's Sam's Club account. The defendant responded that he only kept the go-cart and did not have the other items. Detective Laughlin asked the defendant if he could look inside his house to confirm that the items were not there. The defendant agreed to allow the officers to look inside his house. The defendant secured the dogs that were in the fenced front yard and allowed the police officers into his home. There were women and children in the home.

The officers conducted a cursory search through the main part of the house. They did not open drawers or look inside the bedrooms, bathrooms or closets. The defendant also agreed to allow the officers to look inside a utility trailer. The utility trailer contained a large quantity of lawn mowers and power tools. Some of the tools were in unopened boxes and others appeared new.

After the officers finished their search, the defendant agreed to go to the police station to

---

[2] Defendant objects to the Magistrate Judge's factual findings that Detective Laughlin did not raise his voice and that the Defendant was relaxed. *See* DE 35 (Objections) at 1. The only basis for this objection is the "harsh tone" Detective Laughlin exhibited during cross-examination at the suppression hearing. *Id*. at 2; Mot. Suppress Hrg. Tr. at 86. However, the fact that Detective Laughlin used a "harsh tone" in answering questions posed during cross-examination does not mean that he did so when talking to the Defendant. This is an argument that the Magistrate Judge considered and rejected after observing Detective Laughlin testify; the findings are supported by Detective Laughlin's and Sgt. Raimondi's uncontradicted testimony. *See* Mot. Suppress Hrg. Tr. at 13, 17-18, 52-53. Accordingly, the Magistrate Judge's findings are adopted in this regard.

provide a statement. The defendant was transported to the police station by two police officers in an unmarked vehicle. At the police station, the defendant gave a brief recorded statement which the transcript indicates lasted a total of seven minutes. The defendant's identification card was returned to him at the end of the interview and the defendant called someone to pick him up at the police station. The defendant was never handcuffed.

### The Indictment and Defendant's Motion to Suppress

Defendant is charged with violations of 18 U.S.C. §§ 1029(a)(2) (use of unauthorized access devices); 1029(a)(5) (effecting transactions with access devices issued to another person); 1028A (aggravated identity theft); and 922(g)(1) (possession of a firearm by a convicted felon). *See* DE 1 (Indictment).

In his Motion, Defendant seeks the suppression of the sworn statement he provided at the Pembroke Pines Police Station, arguing that it was the product of an illegal seizure. *See* DE 21 (Motion) at para. 1. Further, pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978), Defendant challenges the accuracy of the affidavit that supported the search warrant executed on his home on March 21, 2006. *Id*. at para. 2 (also arguing that the warrant was "overly broad and general in its description of the property to be seized."). Defendant maintains that the items and statements obtained pursuant to the warrant should be suppressed. *Id*.

The Government responds that Defendant was lawfully stopped pursuant to *Terry v. Ohio*, 392 U.S. 1 (1968), and was twice advised of his *Miranda* rights even though he was never in custody. *See* DE 28 (Response) at 5-9. In addition, the Government rejects Defendant's *Franks* argument, maintaining that the subject affidavit was accurate and that even without the challenged language, the affidavit would be sufficient for a finding of probable cause. *Id*. at 7-8.

5

**Defendant's Objections to the Report**

**a. Terry Stop**

Defendant first "objects to the conclusion of law that the period of time from the moment that Det. Laughlin stopped Mr. Moss until he and the other law enforcement personnel released Mr. Moss constituted nothing more than an investigatory stop, under *Terry v. Ohio*, 392 U.S. 1 (1968)." DE 35 (Objections) at 1-2. Thus, Defendant suggests that with the passage of time his contact with law enforcement became a *de facto* arrest requiring probable cause.

A similar argument was examined in *U.S. v. Acosta*, 363 F.3d 1141, 1144-45 (11th. Cir. 2004), where the Court stated:

> In *Terry,* the Supreme Court adopted a dual inquiry for evaluating the reasonableness of an investigative stop. Under *Terry*'s two-part inquiry, we first examine whether the officer's action was justified at its inception, which turns on whether the officers had a reasonable suspicion that the defendant had engaged, or was about to engage, in a crime. In the second part of the inquiry, determining whether the stop went too far and matured into arrest before there was probable cause, we consider whether [the stop] was reasonably related in scope to the circumstances which justified the interference in the first place.

*Id*. (internal citations and quotation marks omitted).

With respect to the first part of the *Terry inquiry*, the Court agrees with the Magistrate Judge's determination that there was reasonable suspicion for Detective Laughlin to stop the Defendant. *See U.S. v. Williams*, 876 F.2d 1521, 1524 (11th. 1989) (stating that "[r]easonable suspicion is determined from the totality of the circumstances and from the collective knowledge of the officers involved in the stop.") (internal citation omitted). This reasonable suspicion was based on Sgt. Raimondi's communication to Detective Laughlin that he (Raimondi) recognized the Defendant from his driver's license and Sam's Club photographs, and that the go-cart that the

6

Defendant was working on matched the description that was provided by a Sam's Club employee of a go-cart purchased on Sgt. Raimondi's Sam's Club account.

Regarding the second part of the *Terry* inquiry, which concerns the scope of the stop, the Eleventh Circuit applies four non-exclusive factors in distinguishing between a *Terry* stop and an arrest: "[1] the law enforcement purposes served by the detention, [2] the diligence with which the police pursue the investigation, [3] the scope and intrusiveness of the detention, and [4] the duration of the detention." *Acosta*, 363 F.3d at 1146 (internal quotation marks and citations omitted).

The first two factors weigh in favor of the lawfulness of the stop under *Terry*. Detective Laughlin informed Defendant that he was conducting an investigation into fraudulent credit card transactions, elicited Defendant's version of the facts, and in light of Defendant's version, requested permission to conduct a search of the premises and asked that Defendant provide a statement to aid the investigation.[3] The testimony indicates that these actions were carried out in a prompt manner and were "designed to lead to a quick and non-intrusive resolution of the officers' reasonable suspicions." *Acosta*, 363 F.3d at 1146 (noting that the most important consideration in analyzing the law enforcement purposes served by the detention is "whether the police detained [the defendant] to pursue a method of investigation that was likely to confirm or dispel their suspicions quickly, and with a minimum of interference"; the diligence factor concerns "whether the methods the police used were carried out without unnecessary delay.")

---

[3] According to Detective Laughlin and Sgt. Raimondi, Defendant indicated that an individual of Nigerian origin that the Defendant met at a park arranged the transaction through which Defendant purchased the go-cart and other items. *See* Mot. Suppress Hrg. Tr. at 13-14, 18, 49-50. Defendant agreed to cooperate in the investigation of this individual. *Id*. at 18, 56, 59.

(internal quotation marks omitted).

Under the third factor the question is "whether the scope and intrusiveness of the detention exceeded the amount reasonably needed by police to ensure their personal safety." *Id*. In this case, the officers did not draw their weapons nor handcuffed the Defendant. Rather, the two armed officers wearing plain clothes (Laughlin and Raimondi) were later joined by a uniformed Miami-Dade County police officer. *See* Mot. Suppress Hrg. Tr. at 16, 51. Defendant accompanied the officers as they conducted a cursory search of his house and utility trailer. *Id*. at 15-16, 51, 54-55. After Defendant agreed to provide a statement at the police station, two additional officers arrived to transport him;[4] he was patted down, not handcuffed, prior to entering this vehicle. *Id*. at 18-19, 56. Throughout this time the officers had non-confrontational conversations with the Defendant and he was cooperative. *Id*. at 13, 17-18, 53, 56. Under these circumstances, it cannot be said that the scope and intrusiveness of the detention exceeded the amount reasonable needed by the officers to ensure their personal safety. Thus, this factor also weighs in favor of a lawful *Terry* stop.

The fourth factor is "whether the duration of the detention was reasonable." *Id*. at 1147 (also noting that there "is no rigid time limitation or bright line rule regarding the permissible duration of a *Terry* stop."). Here, Defendant's contact with law enforcement lasted approximately ninety five minutes from the time Defendant was approached by Detective Laughlin to the time when he finished his statement at the police station. *See* Mot. Suppress Hrg.

---

[4] According to Detective Laughlin, police procedures require the presence of two officers in a vehicle to transport an individual. *See* Mot. Suppress Hrg. Tr. at 56. Because Detective Laughlin and Sgt. Raimondi drove alone, they could not transport Defendant to the station and had to call the two additional officers. *Id*.

Tr. at 62-63 (indicating that Detective Laughlin initially contacted Defendant at approximately 1:45 p.m.); DE 21 (Motion), Ex. "1" at 6 (indicating that Defendant finished his statement at 3:19 p.m.). The length of this encounter is not unreasonable given what transpired in the interim. Specifically, after obtaining Defendant's identification and allowing Defendant to take his child inside the house, Detective Laughlin read Defendant his *Miranda* rights and confirmed that he understood the same. *Id*. at 11-12, 46-48. Then he elicited Defendant's version of the underlying facts, after which the officers conducted a brief search of Defendant's house and utility trailer; Defendant consented to this search and was allowed to restrain his dogs prior to it. *Id*. at 13-17, 49-55. The officers called a tow truck to tow the go-cart that Defendant admitted to purchasing at Sam's Club, and called a police photographer to take pictures of the go-cart and other items Defendant kept in the premises. *Id*. at 18, 55. When Defendant agreed to provide a recorded statement, two additional officers were called to transport him to the police station. *Id*. at 18-19, 56. The taking of the statement lasted seven minutes. *See* DE 21 (Motion), Ex. "1" at 1, 6. Although this fourth factor does not clearly weigh in favor of a lawful *Terry* stop,[5] considering the diligent nature of the investigation, Defendant's consent to the search, and his agreement to provide a statement to aid the investigation, the duration of the detention was reasonable.

Moreover, although Detective Laughlin decided not to arrest Defendant on the day in question, his investigation was supported by probable cause, at the latest, by the time when Defendant admitted to purchasing the go-cart with the Sam's Club card that was added to Sgt.

---

[5] *See, e.g., U.S. v. Place*, 462 U.S. 696, 709-10 (1983) (declining to adopt a time limitation for a permissible *Terry* stop but noting that the Court had never approved a seizure "for the prolonged 90-minute period" involved in that case and that it could not do so "on the facts presented by [the] case." (which the Court considered less than diligent)).

Raimondi's account. This occurred approximately half an hour into the stop, before Defendant's house was searched. *See* Mot. Suppress Hrg. Tr. at 13-15, 28, 49-50, 71; *U.S. v. Dunn*, 345 F.3d 1285, 1288-92 (11th. Cir. 2003) (outlining considerations of *Terry* stops, *de facto* arrests, and probable cause). The presence of probable cause at that point in time obviates the need to determine whether the subsequent detention was reasonable. *See, e.g., U.S. v. Simmons*, 172 F.3d 775, 781 (11th. Cir. 1999) (noting that the development of probable cause after the initial stop obviated the need to ascertain whether a continued detention past that point would have been reasonable).

**b. Defendant was Free to Leave**

Defendant also objects to the Magistrate Judge's conclusion that "[i]n view of all the surrounding circumstances, a reasonable person would have believed he was free to leave during the defendant's encounter with the police." DE 30 (Report) at 6 (also noting that "even if the defendant was not free to leave, there was sufficient probable cause to seize the defendant if the police had chosen to do so."); *see* DE 35 (Objections) at 2. In objecting to this determination, Defendant submits that "the detective seized [Defendant's] identification, thus communicating that he was not free to leave", and that the officers parked their vehicles close to Defendant's vehicle, suggesting that Defendant's ability to exit was not unobstructed. *See* DE 35 (Objections) at 2. In addition, Defendant submits that the police "were essentially camped out in front of [Defendant's] home, leaving him nowhere to go" and that "[a]lthough the Report . . . suggests that he could go inside the house, there is no indication that he could leave his house." *Id*. (also noting that there is no explanation to support the conclusion that there was probable cause sufficient to justify a detention).

10

The Court first notes that "[w]hile restriction on freedom of movement is a factor to be taken into account in determining whether a person is under arrest, it alone is not sufficient to transform a *Terry* stop into a *de facto* arrest. . . . [A]n investigatory stop is not an arrest despite the fact that a reasonable person would not believe he was free to leave.'" *Acosta*, 363 F.3d at 1147-48 (acknowledging that "a suspect who is detained during a *Terry* stop is not free to leave from the beginning of the stop until it ends.").

In this case, even if Defendant was not free to leave, it is evident that this consideration would not convert the stop into a *de facto* arrest. Detective Laughlin approached the Defendant stating that he was conducting an investigation. Although he asked for Defendant's driver's license and read him his *Miranda* rights (which Defendant indicated he understood), the Detective specifically informed Defendant that he would not be arrested that day. There is no indication that Defendant was threatened in any respect; rather, the evidence is that Defendant, who is not unfamiliar with the criminal justice system, chose to cooperate with the police investigation by providing a version of the underlying facts under which his involvement would be minimized and the investigation would be steered in the direction of a Nigerian individual that Defendant purportedly met at a park. The officers' conversations with the Defendant were conducted in a non-aggressive, cordial manner and Defendant was not handcuffed or otherwise restrained. Thus, even if a reasonable person in these circumstances would not have initially believed that he was free to walk away, that person would have believed that he could cease cooperating with the officers and certainly, decline to go to the police station to provide a statement as Defendant chose to do.

Accordingly, after considering the totality of the circumstances outlined above, the Court

finds that Defendant's stop never matured into a *de facto* arrest as Defendant suggests.

### c. Consent to Search

Defendant also objects to the Magistrate Judge's determination that "the totality of the circumstances demonstrate that the defendant voluntarily consented to the search [of his home]." DE 30 (Report) at 6; *see* DE 35 (Objections) at 2. Defendant submits that his consent was the product of implied coercion, as he was confronted in front of his house with armed police officers while one of his children was with him and other family members were in the house. *See* DE 35 (Objections) at 2.

> As stated in *Acosta*:
>
> A consensual search is constitutional if it is voluntary; if it is the product of an essentially free and unconstrained choice. Voluntariness is a question of fact based on the totality of the circumstances. The government bears the burden of proving both the existence of consent and that the consent was not a function of acquiescence to a claim of lawful authority but rather was given freely and voluntarily.

*Acosta*, 363 F.3d at 1151 (internal citations and quotation marks omitted).

Consistent with the previous discussion, the Court finds that Defendant voluntarily consented to the search of his house as part of his cooperation with the police investigation. Again, Defendant was specifically advised of his rights under *Miranda* and told he would not be arrested that day. Defendant chose to cooperate and consented to the search of his house to confirm his statement to the officers that he had not kept additional items (other than the go-cart) purchased on Sgt. Raimondi's account.

### d. *Miranda*

Defendant also objects to the Magistrate Judge's determination that Defendant voluntarily waived his *Miranda* rights with respect to the statement provided at the police station. *See* DE 30 (Report) at 8; DE 35 (Objections) at 3. Defendant submits that hours and much activity occurred between the time when he was read the *Miranda* warning and when the statement at issue was given. *See* DE 35 (Objections) at 3. Defendant notes that the warning was not repeated immediately before the statement was given, that the officer simply referred to the earlier reading in general fashion. *Id*.

The Court finds that Defendant's argument is without consequence to his motion to suppress because Defendant was never in custody as contemplated by *Miranda*; thus, a *Miranda* waiver was not required in this case. *See, e.g., Acosta*, 363 F.3d at 1148-50 (examining the issue in the context of a *Terry* stop); *California v. Beheler*, 463 U.S. 1121 (1983) (noting that *Miranda* warnings are not required in non-custodial interrogations as when a suspect voluntarily comes to a police station and is allowed to leave unhindered by police after a brief interview); *U.S. v. Diaz-Lizaraza*, 981 F.2d 1216, 1222 (11th. Cir. 1993) (stating that "Mirandizing a detainee does not convert a *Terry* stop into an arrest," although it may constitute evidence in that regard.).

Moreover, Defendant had been *Mirandized* approximately ninety minutes prior to the taking of the statement. *See* Mot. Suppress Hrg. Tr. at 47-48, 62-63; DE 21 (Motion), Ex. "1" at 1. Even if in custody, there was no need for another reading of the warning at the police station. *See Jarrell v. Balkcom*, 735 F.2d 1242, 1254 (11th. Cir. 1984) (rejecting argument that *Miranda* warning should have been repeated where three hours and much activity had occurred between the time the defendant had received his *Miranda* warning and the confession).

### c. Defendant's Request for a *Franks* Hearing

Defendant's final objection addresses the Magistrate Judge's conclusion that "defendant has failed to prove that the government's affidavit contained false statements, made knowingly and intentionally or with reckless disregard for the truth as required by *Franks*." DE 30 (Report) at 9; *see* DE 35 (Objections) at 3-4. This finding pertains to the affidavit supporting the search warrant of Defendant's home, which states:

> [Defendant] agreed to an interview at the Pembroke Pines Police Department. **After being advised of his *Miranda* rights again**, [Defendant] waived his rights and provided a taped statement to Detective Laughlin, admitting his use of Sgt. Raimondi's Sam's Club account.

DE 21 (Motion), Ex. "2" at para. 11 (emphasis added). The transcript of the recorded statement provides in pertinent part:

> Q: Mr. Moss, prior to s, [sic] conducting this interview, and when I made contact with you at your residence, you were read your rights at that time. Is that not correct?
> A: Correct. . . .
> Q: And at that time, you fully understood your rights. Is that correct?
> A: Yes.
> Q: All right. And you're willing to talk to me at this time, correct?
> A: Correct.

DE 21 (Motion), Ex. "1" at 1.

Defendant submits that the language in bold emphasis above is a misstatement and that "[t]he evidence adduced at the suppression hearing leaves no doubt that neither Detective Laughlin nor any other law enforcement officer read the *Miranda* warnings to [Defendant] at the police station." DE 35 (Objections) at 3.

As previously noted, a *Miranda* waiver was not required in this case because Defendant was not in custody for purposes of *Miranda*. Further, no false statement made knowingly and intentionally, or with reckless disregard for the truth, can be ascertained from the foregoing excerpts or the record. It is apparent that Detective Laughlin's questions at the police station referred to the *Miranda* rights he "read" to the Defendant "at [his] residence," (*i.e.* there is no indication that the Detective read Defendant any rights, other than *Miranda*, at his residence). Although the rights were not read again at the police station, Defendant was "advised" of the rights inasmuch as he was referred to the prior reading and Defendant acknowledged that he had been read the rights, that he understood the same, and that he was willing to provide the statement. Thus, the Court is not persuaded by this argument.

Accordingly, the Court having conducted a *de novo* review of the objected portions of the Report and being otherwise fully advised in the premises, it is hereby

ORDERED AND ADJUDGED that the Magistrate Judge's Report (DE 30) is RATIFIED, AFFIRMED AND ADOPTED. It is further

ORDERED AND ADJUDGED that Defendant's Motion to Suppress Evidence and Statements (DE 21) is DENIED

DONE AND ORDERED in Chambers at Miami, Florida, this 2d day of January 2007.

                                              URSULA UNGARO
                                              UNITED STATES DISTRICT JUDGE

copies provided:
Counsel of Record